# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01406-COA

JAMES LEE JOHNSON, III A/K/A JAMES          APPELLANT
JOHNSON, III A/K/A JAMES L. JOHNSON, III
A/K/A JAMES JOHNSON

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/08/2016 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/28/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE IRVING, P.J., CARLTON AND GREENLEE, JJ.

### GREENLEE, J., FOR THE COURT:

¶1. On January 25, 2016, a Quitman County grand jury indicted James Lee Johnson III for acting individually, or while aiding and abetting or acting in concert with Larry Gilliam Jr., to commit the first-degree murder of Curtis Mumford. Johnson was tried individually, and the jury found him guilty as charged.

¶2. On appeal, Johnson claims that his retained trial counsel was ineffective because he provided no opening statement, and failed to challenge the State's evidence. In support, Johnson argues trial counsel did not (1) request an expert to review the State's forensic

evidence; (2) attempt to establish the voluntariness of Johnson's statements to police; or (3) offer jury instructions on any theory of defense. Finding insufficient evidence within the trial record to evaluate an ineffective-assistance-of-counsel claim, we affirm Johnson's conviction and sentence, and dismiss this claim without prejudice so that Johnson may pursue the claim in a properly filed motion for post-conviction relief.

## BACKGROUND

¶3.     On June 7, 2015, Johnson and Larry Gilliam went to Troy Holmes's house to ask whether Holmes had paid Curtis Mumford for cutting his grass.[1] Holmes told them he paid Mumford $40. In response, Johnson said he was going over to Mumford's house to talk to him, and explained Mumford owed him some money. Holmes testified he had not seen Mumford since the day before he spoke with Johnson and Gilliam, and stated that the day after Johnson and Gilliam visited his house, he noticed Mumford's home was being investigated as a crime scene.

¶4.     On Monday, June 8, 2015, Detective Darryl Linzy of the Quitman County Sheriff's Department went by Mumford's house after receiving a request for a check on Mumford's welfare. Detective Linzy knocked on the door, but no one answered. He noticed the door was unlocked, so he went inside. He found Mumford lying on the floor. After determining Mumford was dead, Detective Linzy contacted authorities. Detective Linzy then secured the scene with yellow tape, and went across the street to speak to Holmes. Johnson was identified as a person of interest. Law-enforcement agents from Quitman County, with the assistance

---

[1] Holmes explained that Mumford lived across the street from him, and often did handiwork for him and cut his grass.

2

of Mississippi Bureau of Investigation (MBI) agents, eventually located Johnson at his parents' home, and took him into custody.

¶5. When Johnson was picked up, his father consented to a search of the house, which produced a bicycle belonging to Johnson, and the shirt that Johnson had reportedly worn the day before.

¶6. Johnson waived his *Miranda*[2] rights, and gave several different versions of the events surrounding Mumford's death. Detective Linzy, Agent Bryan Sullivant, and Lieutenant Charles Hale were present during the interview in which Johnson told officers details about how Mumford was killed.[3] He gave several different versions as to what happened that day. Initially, Johnson denied being at Mumford's house. He said he did not see Mumford or go to his home that day, but he admitted that he knew Mumford.

¶7. Later, Johnson changed his story and said Mumford owed him $20 for his help in cutting his neighbor's grass, and said he learned from the neighbor Mumford had recently been paid.[4] Johnson also said he went to Mumford's house to retrieve his money, but Mumford was not home, so he left. Johnson was adamant that he did not go back to Mumford's house, and that he never saw Mumford that day.

¶8. Eventually, Johnson changed his story again. He said that he and Gilliam did go back to Mumford's home. He said he talked to Mumford and asked about the $20 Mumford owed

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] Sullivant and Hale are both agents with the MBI.

[4] Johnson planned to give Gilliam $10 of the $20 Mumford allegedly owed him.

him; that Mumford said he would get the money later; and that they watched the end of a movie. Johnson said he left after the movie, and did not touch Mumford.

¶9. Finally, Johnson agreed to tell "[his] side of the story." Johnson repeated the third version of his account, but he added that Gilliam stabbed Mumford with hedge clippers. Johnson explained that when Mumford told him that he did not have the money he owed him, Johnson stood up and pushed Mumford. After Johnson threw the first punch, he and Mumford began to fight, and, at one point, Johnson choked Mumford. Johnson said that weapons were used, but denied that he used any.[5] He said Gilliam went through the house and retrieved the weapons, which he then used against Mumford. Johnson said Mumford's blood might have gotten on his hands at some point.

¶10. The interview lasted approximately one hour, and it ended when Johnson said he wanted an attorney. However, the next day, Johnson requested to speak to Detective Linzy. Detective Linzy testified he did not make any promises or threats to induce Johnson's statements during the second interview.

¶11. During the second interview, Johnson repeated his final version of what happened, but added some details. Johnson explained when the fight between himself and Mumford broke out, Johnson struck Mumford, and straddled him on the ground while Gilliam struck Mumford with the hedge clippers. When they finally stopped beating Mumford, Johnson and Gilliam used water to clean the blood off them. They also grabbed some of Mumford's clothing and dried their hands off. Johnson initially told Detective Linzy that he hid the hedge

---

[5] Johnson had bruises and scratches on various parts of his body. Initially, he described them as old wounds, but later admitted they were from the fight with Mumford.

4

clippers in some bushes, but later admitted he and Gilliam hid them in a container inside Mumford's closet and covered them with clothes. Johnson told Detective Linzy that he hit Mumford in the face and chest area, and said that Gilliam struck Mumford in the back of the head. He also told Detective Linzy that he and Gilliam were probably in the house for about five minutes after the assault. Johnson said he returned to his house at 1:30 a.m. and noticed blood on his face, which he washed off. Although Detective Linzy could not recall whether Johnson had said whether Mumford was dead by the time they left the house, he remembered Johnson stating, "we killed him. I ain't gonna lie."

¶12.    At trial, the State called experts in crime-scene analysis, serology, DNA analysis, and forensic pathology. They discussed Mumford's injuries and the efforts taken to cover up the crime. A forensic pathologist testified that Mumford suffered thirteen stab wounds in varying depths to his chest, back, left arm, neck, and head. He explained that Mumford suffered a blow to his skull, which was likely caused by something with a flat edge, or a type of single-edged knife. The forensic pathologist stated that the hedge clippers would be consistent with Mumford's skull injury, but he was unable to tell whether the hedge clippers were consistent with Mumford's stab wounds. He concluded Mumford's cause of death was multiple sharp-force injuries, including stab wounds; and his manner of death was homicide.

¶13.    Photographs taken at Mumford's home revealed blood spattered throughout several rooms. Items submitted for testing included Johnson's fingernail clippings; Johnson's clothing and shoes recovered from the jail; Johnson's bike seat; and the hedge clippers and hammer recovered from Mumford's home. A serologist testified that the hedge clippers

5

tested positive for blood. He also stated that one of Johnson's shoes, Johnson's bike seat, and the hammer tested "presumptive positive" for blood.[6] A DNA analyst testified that Mumford's DNA was found on Johnson's shoe, Johnson's fingernails, and the hedge clippers.

¶14. After the State rested its case-in-chief, defense counsel moved for a directed verdict, and argued there was no evidence Johnson aided, assisted, or acted in concert with Gilliam to commit murder. The trial court denied the motion and found that the State had presented sufficient evidence for the case to go to the jury. The defense rested its case without calling any witnesses, and the State finally rested. After considering the evidence presented and the instructions given, the jury found Johnson guilty of first-degree murder. Johnson was sentenced to life in the custody of the Mississippi Department of Corrections. Following the denial of his post-trial motions, Johnson timely appealed.

## DISCUSSION

**Whether Johnson's trial counsel was ineffective.**

¶15. Johnson claims his trial counsel was ineffective because he "called no witnesses, neglected to give an opening statement, filed no motion to suppress the voluntariness of an unrecorded statement to police, and requested no expert for independent forensic investigation." Johnson also claims the jury was "not instructed on any viable theory of

---

[6] The serologist explained that a presumptive test involves a phenolpthalein chemical test, which tests positive by changing color when an item has the characteristics/components of blood. The serologist chose to presumptively test Johnson's shoe, Johnson's bike seat, and the hammer because they contained only a small amount of blood, and the serologist wanted to avoid consuming the entire samples to instead preserve them for DNA analysis.

defense," although he does not explain what other theories of defense his trial counsel should have presented.

¶16. While this Court may consider the merits of a claim for ineffective assistance of counsel raised for the first time on direct appeal, it is unusual to do so because "we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim." *Ragland v. State*, 50 So. 3d 1041, 1044 (¶8) (Miss. Ct. App. 2010). The appropriate conclusion is usually "to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief." *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2003) (citing *Read v. State*, 430 So. 2d 832, 837 (Miss. 1983)). We will reach the merits on an ineffective-assistance claim only in instances where "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003). The State does not stipulate that the record is adequate to review this issue. And we do not find the record affirmatively shows ineffectiveness of constitutional dimensions. Therefore, we dismiss Johnson's ineffective-assistance-of-counsel claim without prejudice, so he may pursue the claim in a properly filed motion for post-conviction relief. *See* Miss. Code Ann. § 99-39-7 (Rev. 2015).

¶17. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, WESTBROOKS AND TINDELL, JJ., CONCUR.**